<u>**UNPUBLISHED**</u>

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

No. 05-2386

———————

SUNNY JANI, Administrator of the Estate of
Michael L. Webster, deceased,

Plaintiff - Appellee,

versus

THE BERT BELL/PETE ROZELLE NFL PLAYER
RETIREMENT PLAN; THE NFL PLAYER SUPPLEMENTAL
DISABILITY PLAN,

Defendants - Appellants.

———————

Appeal from the United States District Court for the District of
Maryland, at Baltimore. William D. Quarles, Jr., District Judge.
(CA-04-1606-WDQ)

———————

Argued: September 18, 2006          Decided: December 13, 2006

———————

Before WILKINSON and DUNCAN, Circuit Judges, and Henry F. FLOYD,
United States District Judge for the District of South Carolina,
sitting by designation.

———————

Affirmed by unpublished opinion. Judge Duncan wrote the opinion,
in which Judge Wilkinson and Judge Floyd joined.

———————

**ARGUED:** Edward Arthur Scallet, GROOM LAW GROUP, CHARTERED,
Washington, D.C., for Appellants. Cyril Vincent Smith, ZUCKERMAN
SPAEDER, L.L.P., Baltimore, Maryland, for Appellee. **ON BRIEF:**
Douglas W. Ell, GROOM LAW GROUP, CHARTERED, Washington, D.C., for
Appellants. Sean P. Vitrano, William K. Meyer, ZUCKERMAN SPAEDER,

L.L.P., Baltimore, Maryland; Robert P. Fitzsimmons, Wheeling, West Virginia, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit.

DUNCAN, Circuit Judge:

Mike Webster, the Hall of Fame center best known for anchoring the offensive line of the Pittsburgh Steelers professional football team from 1974 to 1988, developed brain damage as a result of the multiple head injuries he suffered as a player. He was awarded degenerative disability benefits by the administrator (the "Board") of the NFL's retirement plans.[1] The Board acknowledged that injuries sustained during his football career had caused Webster eventually to suffer total and permanent mental disability in September 1995, four years after his retirement, but denied him the more lucrative benefits reserved for those whose disabilities begin while they are still actively playing football.

Webster's estate sued the retirement plans under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001-1461 (2000), claiming that the Board abused its discretion in setting Webster's total disability date at September 1995. The district court ruled that the Board first abused its discretion by ignoring the unanimous medical evidence that established March 1991 as the onset date for Webster's total and permanent disability, and

---

[1]The NFL enrolls all players in the Bert Bell/Pete Rozelle NFL Retirement Plan (the "Plan") and the NFL Player Supplemental Disability Plan (together, the "Plans"). J.A. 98 (Plan art. 2). The operative language determining eligibility for benefits is found in the Plan. The NFL Player Supplemental Disability Plan, in contrast, operates to augment the size of benefits awards after eligibility has been established under the Plan.

second in refusing to toll the Plan's limitations period for filing a claim for disability. The Plans[2] appealed both rulings.

While recognizing that the decisions of a neutral plan administrator are entitled to great deference, we are nevertheless constrained to find on these facts that the Board lacked substantial evidence to justify its denial here. In particular, the Board ignored the unanimous medical evidence, including that of its own expert, disregarded the conclusion of its own appointed investigator, and relied for its determination on factors disallowed by the Plan. Because we also find that Webster's mental incapacity should have tolled the limitations period, we affirm the decision of the district court.

I.

A.

"Iron Mike" Webster played center in the National Football League ("NFL") for the Pittsburgh Steelers from 1974 to 1988, collecting four Super Bowl rings during that era. J.A. 628-29. After becoming a free agent, Webster started for the Kansas City Chiefs in 1989 and played as a backup center in 1990 before retiring from active play in March 1991. J.A. 629. In total,

---

[2]Because the Plans, not the Board, are the Defendants in this case, we refer to the Board when discussing Webster's application process and to the Plans when discussing party actions during litigation.

Webster played 245 games, the most ever by a center, and at one point played six years without missing a single offensive down. J.A. 622-24. Webster was designated an All-Pro nine times during his career and was inducted into the Pro Football Hall of Fame in 1997. Id.

Webster endured numerous blows to the head as a center. J.A. 622. The center is the player in the middle of the offensive line and is responsible for snapping the football between his legs to the quarterback to begin each offensive play. Defensive players are permitted to rush at the quarterback as soon as the football is snapped. The center is particularly vulnerable because he must right himself after the snap to protect the quarterback from the oncoming defensive rush. Of particular danger to offensive linemen in Webster's era was the "head slap" technique, in which defensive linemen would begin their quarterback rush by striking the offensive linemen on the sides of the helmet to daze them. J.A. 676. Though made illegal by an NFL rule change in 1977, use of the head slap and other violent techniques by defensive linemen continued. J.A. 683-84.

After playing sixteen years and sustaining multiple concussions, Webster retired from football in March 1991. His remaining eleven years of life were plagued by a series of failed business ventures and stunted career attempts. In fact, the

parties agree that none of these attempts at gainful employment succeeded.  J.A. 695.

First, Webster was hired to work as a football analyst for NBC in July 1991.  J.A. 629.  After auditioning in two preseason games, he moved back to Wisconsin and did not continue this work.  J.A. 647.  Webster also tried his hand as an investor.  In May 1992, for example, he invested in "Webster Asset Management, Ltd." and in "Terra Firma Development Trust," which owned real estate in Pittsburgh.  J.A. 479, 629.

Webster made a number of representations about his employment status in 1993 and 1994.  For example, he told a doctor in May 1993 that he was working "as a financial investment advisor and real estate manager."  J.A. 266.  He told another doctor during a hospital stay in June 1993 that he was running "several self-owned business [sic] in Pittsburgh," J.A. 277, and that he was part-owner of Olympia Steel, J.A. 294.  In August 1993, he applied for a credit card, calling himself the manager of Distinctively Lazer for the previous six months and representing that he earned $80,000 per year.  J.A. 458.  In September 1993, Webster told a doctor that he was employed full-time.  J.A. 264.  In October 1993, Webster and two others registered the name "Tins, Totes and Tees" for a business to conduct retail sales.  J.A. 630.

It is undisputed, however, that none of these business ventures generated income.  Tax records, social security records,

and Webster's own affidavit show that his only income during 1991-1993 consisted of his final payments from the Chiefs in 1991, deferred payments from the Steelers in 1992, and fees of $10,000 for card-signing and appearances in 1992 and 1993. J.A. 704-49. In fact, an associate of Webster's at Distinctively Lazer told the Board's investigator, "I think there was something mentally wrong with Mike. His business thinking was very poor." J.A. 700-01.

Webster returned to football in 1994 as a strength and conditioning coach for the Chiefs. The Assistant General Manager of the Chiefs indicated that Webster was hired "as a favor" and that he was not "doing very well during this time period and . . . may have been living in his car." J.A. 699. Webster later averred that as a strength and conditioning coach he had no "specific coaching duties but was there supposedly to help out if necessary." J.A. 709. In November 1994, Webster showed up at a friend's house, stating that he "was tired of sleeping in his car." J.A. 652. The friend, citing Webster's "strange habits," allowed him to stay for a few months. J.A. 653. Webster left the coaching position at some point in 1995, having earned a total of about $30,000 from the Chiefs for his services. J.A. 409. Webster's former teammates told the Board's investigator that beginning in 1995 through 1997, Webster did not appear well, with some "characterizing his behavior as strange or paranoid." J.A. 518.

Webster was mostly unemployed after 1995, earning essentially nothing until his death in 2002. The Board's investigator summarized Webster's post-retirement history by noting that he found no "evidence that any of [his business ventures] succeeded." J.A. 519. He concluded, "It is unclear whether any of these ventures were successful and whether or not Mr. Webster's health has affected his ability to operate these business ventures." J.A. 464.

Webster had contacted the Board on five occasions in 1995 and 1996, sometimes only days apart, each time seeking an application for filing a disability claim. J.A. 206-210, 215, 218. Not one of these applications was ever completed. Webster was diagnosed in 1998 with brain damage resulting from multiple head injuries he incurred while playing football. In the spring of 1999, Webster finally completed an application for disability benefits under the NFL retirement plans. We now examine the language of those plans.

B.

The Plans provide for four types of benefits for players who suffer a total and permanent ("T&P") disability as a result of football, two of which are relevant here. An applicant may qualify for "Active Football" benefits if "the disability(ies) results from League football activities, arises while the Player is an Active Player, and causes the Player to be totally and permanently

8

disabled 'shortly after' the disability(ies) first arises." J.A. 110 (Plan § 5.1(a)). A lesser benefit, styled "Football Degenerative," is available provided that "the disability(ies) arises out of League football activities, and results in total and permanent disability before the later of (1) age 45, or (2) 12 years after the end of the Player's last Credited Season." J.A. 110 (Plan § 5.1(c)).

Common to both types of benefit, then, is the requirement that an applicant prove that he suffered a T&P disability as a result of playing football. An applicant "will be deemed to be totally and permanently disabled if the Retirement Board finds that he has become totally disabled to the extent that he is substantially prevented from or substantially unable to engage in any occupation or employment for remuneration or profit." J.A. 111 (Plan § 5.2). However, "[a] Player will not be considered to be able to engage in any occupation or employment for remuneration or profit . . . merely because such person is employed by the League or an Employer . . . or is employed out of benevolence." Plan § 5.2 (J.A. 112) (emphasis added); see also J.A. 93 (Plan § 1.13) (defining "Employer" as "a member Club of the League"). The Board may require an applicant "to submit to an examination by a competent physician or physicians selected by the Retirement Board and may be required to submit to such further examinations as, in the opinion of the Retirement Board, are necessary to make an adequate

9

determination respecting his physical or mental condition." J.A. 112 (Plan § 5.2).

To be eligible for the higher Active Football benefits, an applicant must also show that he became disabled while an Active Player, which disability became T&P "shortly after" it first arose. Each of these elements is defined further in the Plan. A player remains an "Active Player" upon retirement until the July 15 following his retirement or the first day of the next preseason training camp, whichever is later. See J.A. 91 (Plan § 1.1). An applicant becomes T&P disabled "shortly after" the disability first arises for purposes of the definition of Active Football benefits according to a three-tiered scheme of presumptions:

> A player who becomes totally and permanently disabled no later than six months after a disability(ies) first arises will be conclusively deemed to have become totally and permanently disabled "shortly after" the disability(ies) first arises, . . . and a Player who becomes totally and permanently disabled more than 12 months after a disability(ies) first arises will be conclusively deemed not to have become totally and permanently disabled "shortly after" the disability(ies) first arises . . . . In cases falling within this six- to twelve-month period, the Retirement Board will have the right and duty to determine whether the "shortly after" standard is satisfied.

J.A. 111 (Plan § 5.1).

Even if an applicant otherwise would succeed in earning Active Football or Football Degenerative benefits from the onset date of his T&P disability, a limitations provision, added to the Plan and effective for claims received on and after November 1, 1998, may

10

prevent him from recovering certain time-barred benefits. Specifically:

> [N]o total and permanent disability benefit . . . will be payable with respect to any month or other period of time that precedes by more than forty-two (42) months the date the Plan Director first receives a written application or similar letter requesting such benefit, provided that such written application or similar letter begins the administrative process that results in the award of the benefit.

J.A. 151 (Plan § 5.7).  Section 5.7 also includes a tolling provision, however:

> The forty-two month limitations period in each of the above sentences will be tolled for any period of time during which such Player is found by the Retirement Board to be physically or mentally incapacitated in a manner that substantially interferes with the filing of such claim.

Id.


C.

Webster applied for Active Football benefits and, in the alternative, Football Degenerative benefits in the spring of 1999. In support of his claim, Webster submitted his post-retirement medical records and the reports of Dr. Fred Krieg, Dr. James Vodvarka, and Dr. Jonathan M. Himmelhoch.

Webster's medical records revealed that he sought medical treatment for certain physical ailments between March 1991 and September 1995.  In late 1992, for example, Webster began to suffer from an "extensive lymphedema," or fluid collection resulting in

11

swelling, "involving both lower extremities." J.A. 273, 276. In May 1993, a CT scan revealed a likely lymphoma, or cancer of the lymph nodes. J.A. 274-75. Webster checked into a hospital in June 1993 under the care of Dr. Stanley Marks, a hematologist and oncologist. A treatment regimen orchestrated by Dr. Marks led to improvement in Webster's physical condition over the subsequent several months. J.A. 264, 269-72.

Webster then saw Dr. Robert Conn, a cardiovascular specialist, for an echocardiogram in January 1994. J.A. 295. Dr. Conn noted in a contemporaneous letter that "Mr. Webster is capable of most <u>physical</u> activities that would be relevant to his age and recreational desires." J.A. 295-96 (emphasis added).

Webster followed up with Dr. Marks on September 5, 1996. Dr. Marks noted that Webster's "life has really deteriorated recently and he is living out of his car. His income has been nominal. He has major problems with depression and obsessive compulsive behavior and is currently being treated with Ritalin and Paxil." J.A. 265.

Later that day, Webster met with Dr. Jerry Carter, a psychiatrist, because some of his former teammates had "encouraged him to have an evaluation" after Webster was found sleeping in a local train station. Webster told Dr. Carter that he had been living in hotels and in his car for the previous three-and-one-half years. Webster also insisted that he need only overcome his

12

reclusive tendencies and then his mood and ability to function "would improve considerably." Webster recounted a tumultuous childhood, a history of low self-esteem, and that he was living only for his periodic visits with his children in Wisconsin. J.A. 307.

Webster then saw Dr. Vodvarka, an osteopath and practitioner of internal medicine, in late 1997. J.A. 300-03. Dr. Vodvarka recognized that Webster might be suffering from post-concussion syndrome. J.A. 302.

Webster retained an attorney, Mr. Robert P. Fitzsimmons, to assist him in applying for disability benefits. Fitzsimmons referred Webster to Dr. Krieg, a psychologist, to determine whether Webster was disabled. In November 1998, Dr. Krieg diagnosed Webster with brain damage--that is, dementia resulting from his football-related head traumas. J.A. 227. Dr. Krieg observed that "although it is [to] Mr. Webster's advantage to have 'done poorly' on this evaluation, he really tried throughout the interview to make himself look as good as possible, covering up certain information." J.A. 225. Dr. Krieg concluded that Webster "had become disabled to the extent that he is substantially unable to engage in any occupation or employment at this time." J.A. 232.

Webster was reevaluated by Dr. Vodvarka, who opined in an open letter dated March 1999 that Webster "would have been able to prove total disability at the time he was released by the Pittsburgh

13

Steelers" because of his dementia and cognitive dysfunction.  J.A. 253, 257.  Dr. Vodvarka linked Webster's mental ailments to the head injuries suffered during his years of football, and concluded that Webster "will never be able to engage in any occupation or employment for remuneration or profit."  J.A. 259.

Webster also met with Dr. Himmelhoch, a psychiatrist, in a series of six sessions beginning in March 1999.  J.A. 315.  Dr. Himmelhoch opined, in a letter to the Plans dated June 22, 1999, that Webster suffered from "traumatic or punch drunk encephalopathy[3]" resulting from football, leaving him totally and permanently disabled.  J.A. 317-20.

Finally, Webster submitted an affidavit stating that he had been unable to perform any productive work for the Chiefs during his coaching tenure in 1994 and 1995 because of the crippling nature of his brain damage.  J.A. 709.  He explained that "[s]ince completing my football playing years, I have been unable to obtain or keep any type of meaningful and/or gainful employment because of the problems I have experienced from my brain injury."  J.A. 710.

Responding to Webster's application, the Board required Webster to be evaluated by a neurologist of its choosing, Dr. Edward Westbrook, on June 21, 1999, pursuant to Plan section 5.2. On a form provided by the Board for his completion, Dr. Westbrook

---

[3]Encephalopathy literally means "brain disease."  Random House Webster's Unabridged Dictionary 640 (2001).

14

answered the question "When did present disability occur?" with "3/91 or before." J.A. 362. In an accompanying letter dated October 28, 1999, Dr. Westbrook indicated that though Webster offered only a "poor history," he was able to determine that Webster was "completely and totally disabled." J.A. 367.

On the same date that Dr. Westbrook's report issued, the Board awarded Webster Football Degenerative benefits prospectively without setting an onset date for his T&P disability and tabled Webster's application for Active Football benefits "to allow [a] neutral physician to review additional medical information and make [a] final report." J.A. 374.

Webster appealed the decision, which appeal was denied on May 8, 2000 by the Board. J.A. 397-99. First, the Board diminished the significance of its own medical expert's report because the report only indicated when Webster became disabled, not when he became <u>totally and permanently</u> disabled. Second, the Board discounted Dr. Vodvarka's assessment that Webster was totally and permanently disabled as of 1988. Because Webster played two more seasons after 1988 with the Chiefs, the Board concluded that Dr. Vodvarka must have misinterpreted the Plan's definition of "T&P disability." Finally, the Board chided Webster for failing to submit sufficient evidence showing that he did not work from 1991 onward. J.A. 399.

15

Webster appealed again. This time, to respond to the Board's concerns, Webster submitted supplemental reports from Drs. Krieg and Himmelhoch, each of whom concluded, to a reasonable degree of professional certainty, that Webster was totally and permanently disabled as of March 1991. J.A. 580, 608. Webster also submitted a report from Dr. L. Charles Kelly, an osteopath, setting Webster's T&P disability date at March 1991. J.A. 422-25.

To strengthen the appeal, Webster's attorney asked Dr. Westbrook, the Board's neutral physician, to opine as to the onset date of Webster's T&P disability. Dr. Westbrook wrote to the Board:

> It is clear that the patient had significant trouble playing football in 1990 and officially retired in 1991. It would appear on that basis that he was completely and totally disabled as of the date of his retirement and was certainly disabled when he stopped playing football sometime in 1990. . . . He has remained completely and totally disabled for any occupation beginning in approximately 1990 and will not be expected to improve.

J.A. 565.

The Board responded on October 31, 2000, by again requesting additional documentation to prove Webster's lack of income during the critical 1991 to 1996 period. Webster submitted records from the Internal Revenue Service, the Social Security Administration, the Commonwealth of Pennsylvania, the Kansas City Chiefs and the Pittsburgh Steelers, corroborating his assertion that he earned nothing after his retirement other than his coaching salary from the Chiefs. J.A. 714-49.

16

Not satisfied with this response, the Board also hired a private investigator to delve into the details of Webster's employment history. The investigator found evidence that Webster was nominally involved in various business ventures as detailed above, but concluded that he "was unable to find any evidence that any of them succeeded." J.A. 695. While the investigation was underway, Webster died of a heart attack, on September 24, 2002.

The Board finally denied Webster's application for Active Football benefits on March 17, 2003, and set the onset date for his T&P disability at September 1, 1996. In setting this date, the Board gave the following reasons: (1) Webster's work as a broadcaster for two games in 1991, his series of failed business ventures from 1992 to 1994, and his work as an assistant coach for the Chiefs in 1994 and 1995 demonstrated his ability "to engage in any occupation . . . for remuneration or profit"; and (2) the medical evaluation in 1996 by Dr. Marks stating that Webster's life "has really deteriorated recently" implies that Webster was not mentally disabled during his 1993 visit to Dr. Marks. J.A. 555. The Board made no reference to either the findings of its own medical expert or the other medical evidence that expressly set the onset date of Webster's T&P disability at March 1991.

Webster's estate appealed the Board's March 2003 decision. In July 2003, the Board affirmed by letter its previous determination, disavowing the medical reports of Dr. Krieg, Dr. Vodvarka, Dr.

17

Himmelhoch, Dr. Kelly, and its own Dr. Westbrook because so much time had passed between 1991 and 1997, when the first of these doctors evaluated Webster for brain damage. J.A. 612-16. Noting that these assessments were not performed "contemporaneous[ly] with the suggested onset date" of Webster's T&P disability, the Board deemed such ex post pronouncements as "speculative and conclusory." J.A. 614-15.

The Board also cited for the first time the 42-month limitation provision in Plan section 5.7 that disallows establishment of an onset date for T&P disability earlier than 42 months prior to the filing of the application, unless the applicant's mental incapacity substantially interfered with the filing of the claim. J.A. 615. Finding that Webster had offered no proof of "substantial interference," the Board found that the limitations provision barred the recovery of any benefits prior to January 1, 1996.[4] J.A. 616. This letter of denial marked the Board's final administrative decision.

Webster's estate filed an ERISA complaint in the United States District Court for the District of Maryland, seeking money damages

---

[4]The Board's denial letter referred to January 1, <u>1995</u> as the retroactivity cutoff date. Presumably, the Board intended to utilize the limitations provision to bar recovery of any benefits prior to January 1, <u>1996</u>.

In any case, the parties disagree on which date Webster filed his application for purposes of applying the limitations period. Because we hold that the 42-month rule was tolled here, however, the exact application date is of no moment.

and declaratory relief under § 1132(a)(1)(B) and (a)(3). Both parties moved for summary judgment. The district court granted the Plaintiff's motion, but denied the Plans' motion.

In finding that the Board abused its discretion by denying Webster Active Football benefits, the district court noted that "[e]ach specialist who examined Webster's neurological status concluded that he was totally and permanently disabled under the terms of the Plan by March 1991." Jani v. Bert Bell/Pete Rozelle NFL Player Ret. Plan, No. 04-1606, 2005 WL 1115250, at *6 (D. Md. April 26, 2005). The court further found the lack of diagnosis of mental impairment in 1993 by Dr. Marks, an oncologist, to be insufficient to provide "substantial evidence" to justify denial of Active Football benefits to Webster. Id. The court also cursorily held that because "Webster had been incapacitated by brain damage since 1991, the Plan's limitations period does not apply to his disability claim." Id.

The Plans timely appealed, arguing that the Board's denial of Active Football benefits was a reasoned exercise of discretion supported by substantial evidence and, in the alternative, that the Plan's limitations provision barred recovery of benefits prior to January 1, 1996. We consider each argument in turn.

19

II.

A.

Because the Plans grant the Board "full and absolute discretion, authority and power to interpret . . . the Plan," J.A. 121 (Plan § 8.2), we review the Board's decision under the deferential abuse of discretion standard[5] rather than de novo. <u>See Smith v. Cont'l Cas. Co.</u>, 369 F.3d 412, 417 (4th Cir. 2004) (citing <u>Firestone Tire & Rubber Co. v. Bruch</u>, 489 U.S. 101, 111 (1989)). The Board's discretion, however, is not unfettered. Its exercise must be supported by substantial evidence. <u>Bernstein v. CapitalCare, Inc.</u>, 70 F.3d 783, 788 (4th Cir. 1995).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

---

[5]The Plans seem to argue for an even higher level of deference than that typically afforded ERISA fiduciaries, because of the knowledge and skill required to assess football injuries in particular. <u>See, e.g.</u>, Appellants' Br. at 45 ("The Board believes that the complexity of the Plan here and the unique medical and occupational issues faced by professional football players present special challenges to a decision maker, and that experience with meeting those challenges is important."). To be sure, special knowledge is indeed helpful in making benefits determinations in football, as it is in <u>any</u> industry. The deferential abuse of discretion standard obtains in part precisely because courts cannot have expertise in every industry. <u>See</u> <u>Berry v. Ciba-Geigy</u>, 761 F.2d 1003, 1006 (4th Cir. 1985) ("[T]he standard exists to ensure that administrative responsibility rests with those whose experience is daily and continual, not with judges whose exposure is episodic and occasional."). That our knowledge of football-related disability pales in comparison to the Board's knowledge, however, does not militate to bestowing a higher standard than abuse of discretion. Instead, the Board is entitled to the same abuse of discretion review afforded to knowledgeable fiduciaries of any ERISA plan.

Richardson v. Perales, 402 U.S. 389, 401 (1971) (noting that this definition obtains widely "in varying statutory situations"). It is thus "more than a mere scintilla," id., but "less than the weight of the evidence," Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966).

Because a fiduciary must present substantial evidence to justify a denial of benefits, it logically follows that a fiduciary appears to abuse its discretion when, in denying benefits, it ignores unanimous relevant evidence supporting the award of benefits. Cf. Pikulas v. DaimlerChrysler, 397 F. Supp. 2d 883, 892-93 (E.D. Mich. 2005) (finding an abuse of discretion when a fiduciary denied benefits despite the unanimous evidence of three examining doctors agreeing that the claimant was unable to work); Giannone v. Metro. Life Ins. Co., 311 F. Supp. 2d 168, 177-78 (D. Mass. 2004) (finding an abuse of discretion when a fiduciary denied benefits, citing the opinion of a non-examining physician, which was contrary to the unanimous opinion of several treating physicians, the fiduciary's own investigator, and the claimant's medical history). Similarly, a plan fiduciary abuses its discretion by crediting a doctor's earlier, incomplete evaluation but ignoring the same doctor's later, more comprehensive opinion. Donovan v. Eaton Corp., Long Term Disability Plan, 462 F.3d 321, 329 (4th Cir. 2006).

21

We have required benefits administrators to follow unanimous evidence in other contexts in which we employ an abuse of discretion standard as well. For example, in Stawls v. Califano, 596 F.2d 1209 (4th Cir. 1979), a case involving a social security disability benefits claim, the administrator denied the applicant's claim for T&P disability benefits because it found that she was unable to prove that her T&P disability began prior to 1962 and was continuously present thereafter. Id. at 1213. The administrator ignored the medical opinion of one psychiatrist that the applicant's schizophrenia was indeed continuously disabling, rather than intermittently so, and the medical opinion of another psychiatrist that the disability began prior to 1962. The second psychiatrist, though he had treated the applicant since 1954, had lost his contemporaneous notes. He nevertheless opined in 1976 that the applicant had been disabled prior to 1962. The applicant challenged the denial of benefits in court, and this court ultimately remanded the dispute to the benefits administrator, demanding an explanation for "why the uncontradicted evidence of the psychiatrists should not suffice to afford recovery." Id. Thus, even though the second psychiatrist's ex post and undocumented opinion might have been less weighty were there conflicting medical opinions, it remained uncontradicted and could not therefore be ignored. See id.; see also Martin v. Sec'y of Dept. of Health, Ed. and Welfare, 492 F.2d 905, 907-08 (4th Cir.

22

1974) (holding in a social security disability benefits case that the mere "opinion evidence of the non-examining Social Security doctor" is not "substantial enough to sustain [a denial of benefits] when (a) the claimant's subjective evidence of disability, (b) the expert medical opinion of examining physicians, (c) claimant's vocational history, and (d) the objective medical facts, are all to the contrary").

Similarly, our jurisprudence under the Black Lung Benefits Act, 30 U.S.C. §§ 901-945 (2000), allows a claimant to establish total disability by offering uncontradicted reasoned medical evidence. See, e.g., Milburn Colliery Co. v. Hicks, 138 F.3d 524, 529 (4th Cir. 1998) (citing 20 C.F.R. § 718.204(c)(4) (1997)). It is only "[i]f the evidence is contradicted [that] we must determine whether the ALJ conducted an appropriate analysis of the evidence to support his conclusion." Hicks, 138 F.3d at 529; see also Curry v. Beatrice Pocahontas Coal Co., 67 F.3d 517, 521 (4th Cir. 1995) (finding that three medical opinions did not constitute "substantial evidence" sufficient to justify a denial of benefits because the doctors had not opined "without equivocation" on the dispositive question--whether the claimant "suffer[ed] no respiratory or pulmonary impairment of any kind").[6]

---

[6]We recognize that the standards and processes governing cases involving black lung and social security disability benefits are different from those that apply under ERISA. We refer to this parallel jurisprudence only to show our consistent treatment of unanimous medical evidence in other statutory contexts.

B.

With the foregoing guidance as to what constitutes substantial evidence in mind, we turn to a consideration of the facts on which the Board here based its decision. We do so mindful of the fact that the Board has the discretion to define "T&P disability" in any reasonable and consistent manner. See J.A. 121 (Plan § 8.2(a)); Booth v. Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan, 201 F.3d 335, 342 (4th Cir. 2000).

The Plans proffer two principal justifications for the Board's denial of Active Football benefits. First, the Plans argue that Webster could not possibly have been "substantially unable to engage in any occupation or employment for remuneration or profit," J.A. 111 (Plan § 5.2), because he was actually employed between 1991 and 1996. The Plans cite Webster's stint as a broadcast analyst for two games in 1991, his work as a strength and conditioning coach for the Chiefs in 1994-95, and his ongoing self-employment from 1991 to 1996.

Not one of these ostensible occupations provides substantial evidence that Webster was not "substantially unable to engage in any . . . employment" between 1991 and 1996. First, Webster need only show that he suffered T&P disability "shortly after" his disability first arose upon retirement. Thus, his two-game dalliance ending within six months of retirement does not disprove that he suffered T&P disability "shortly after" retirement. See

24

J.A. 111 (Plan § 5.1). In any case, the medical evidence suggests that his stunted broadcasting career was in fact merely an audition that failed as a result of his diminished cognitive capabilities. Second, Webster's coaching position with the Chiefs is excluded from Board consideration by the plain language of the Plan itself. See J.A. 112 (Plan § 5.2). Section 5.2 provides, "A Player will not be considered to be able to engage in any occupation or employment for remuneration or profit . . . merely because such person is employed by an Employer," that is, by a team, "or is employed out of benevolence." Id. Because Webster was "employed by an Employer," and, moreover, was "employed out of benevolence," the Plan twice deprives Webster's brief coaching spell of any conclusive value. Finally, Webster's occasional representations in the early 1990s that he was gainfully employed and that his various sinecures demanded his "full-time" attention evaporate in the absence of any evidence to show that Webster ever earned a single dollar from or contributed anything other than his name to these enterprises. "[U]nable to find any evidence that any of them succeeded," the Board's own investigator refutes its conclusion that Webster was able to work after retirement. See J.A. 695.

Second, the Plans direct us to the evaluations of Webster by various doctors during the critical period that tended to show he was "generally in good health." See Appellants' Br. at 46. Not one of these doctors, however, was either asked, or for that matter

25

was qualified, to comment on Webster's <u>mental</u> health. That a cardiologist reported, for example, that "Webster is capable of most <u>physical</u> activities that would be relevant to his age and recreational desires" proves nothing regarding the state of Webster's brain damage at the time. <u>See</u> J.A. 285 (emphasis added). Webster has never argued before the Board, nor does his estate argue now, that he was unable to work because of a <u>physical</u> disability.

The Plans lean heavily on the reports of Dr. Marks in particular to prove that Webster was mentally fit in 1993 and 1994, but by September 1996 had suffered a drastic reduction in mental wellness. In examining Webster for pain in his armpit in 1993, Dr. Marks, a hematologist and oncologist, did not record any observations about Webster's mental state. However, in 1996, Dr. Marks reported that Webster's "life has really deteriorated recently." J.A. 265.

The Plans ask us to infer from this change in scope between Dr. Marks's two reports that Webster was not T&P disabled by dint of brain damage in 1993. The Plans assert that had Webster in fact been brain damaged in 1993, "none of the above trained physicians would have missed it." Appellants' Br. at 46. Similarly, the Plans question the lack of any contemporaneous medical evidence between 1991 and 1996 showing that Webster was brain damaged. <u>Id.</u>

26

The Board's own expert, however, opined directly on the question of when Webster's T&P disability began. Dr. Westbrook wrote to the Board, "[Webster] was completely and totally disabled as of the date of his retirement and was certainly disabled when stopped playing football sometime in 1990." J.A. 565.[7]

Thus, the Plans ask us, in short, to do two things: first, to disregard the testimony of the Board's own medical expert (in addition to all the others) because it was not "contemporaneous," a fact of which it had to have been aware when it engaged him, and second, to hold that the absence of contemporaneous evidence is itself "substantial evidence." As inclined as we are to defer to the Board's discretion, the law does not permit such a leap of faith.

We are not unsympathetic to the Board's desire to protect Plan assets in the context of claims of mental disability that may be susceptible of misdiagnosis. However, the Board is not without recourse in this situation. As we have discussed, the Plan itself provides the Board with tools to resolve precisely this type of scenario--an applicant submitting medical evidence that is substantial but which the Board does not find dispositive. The

---

[7]The Board discredited Dr. Westbrook's opinion setting an onset date for Webster's TPD, choosing instead to credit only Dr. Westbrook's earlier opinion that did not provide such a date. Parsing a doctor's opinions, however, to ignore his later, more comprehensive assessment is unreasonable. See Donovan, 462 F.3d at 329.

27

Board availed itself of one such option by enlisting Dr. Westbrook to examine Webster for mental disability.  When Dr. Westbrook returned his reports concurring with Webster's doctors and opining that Webster had become T&P disabled by 1991, the Board was faced with unanimous, albeit ex post, evidence supporting Webster's claim.  If the Board still harbored qualms about the strength of Webster's evidence, it could have easily "required [him] to submit to such further examinations as, in the opinion of the Retirement Board, are necessary to make an adequate determination respecting his . . . mental condition."  See J.A. 112 (Plan § 5.2).  Instead, the Board truncated its medical investigation and chose to ignore not only the views of Webster's experts but also that of its own.[8]

In sum, the Board has offered no relevant medical or employment evidence to contradict the unanimous medical opinion of examining experts, even though those opinions were open to challenge.  Because these expert opinions at least establish a presumption that Webster is entitled to Active Football benefits,

---

[8]The Plans claim that the Board customarily invokes its right to utilize a neutral physician only to determine whether an applicant is T&P disabled, not when he became T&P disabled.  This claim is belied by the record.  In eight other cases of T&P disability due to brain damage, the Board appointed a neutral physician to examine the applicants.  J.A. 757-808.  In every such case in which the neutral physician offered a clear, conclusive assessment of the applicant's disability, the Board chose to follow that neutral recommendation.  Id.  In one case in particular, the Board "based the . . . effective date [of disability] on the . . . report of the Plan neutral psychiatrist."  J.A. 786-92.  Thus, the Plans cannot now escape the uncontradicted opinion of Dr. Westbrook that Webster became T&P disabled by March 1991.

and the Board did not rely on substantial evidence to contradict them, we conclude that the Board abused its discretion in denying Webster Active Football benefits.[9] Cf. Stawls, 596 F.2d at 1213 (remanding and demanding an explanation for "why the uncontradicted evidence of the psychiatrists should not suffice to afford recovery").

## III.

The Plans urge us in the alternative to bar recovery of any benefits that accrued prior to January 1, 1996, pursuant to the Plan limitations provision. Section 5.7 provides that "no total and permanent disability benefit . . . will be payable with respect to any month or other period of time that precedes by more than forty-two (42) months" the T&P benefits application date. J.A. 151 (Plan § 5.7).

Webster's estate concedes that Plan section 5.7 applies to his application, but insists that the limitations period should be

---

[9]Webster's estate argues further that the Board abused its discretion because its "decisionmaking process was [not] reasoned and principled." See Booth, 201 F.3d at 342. Five years and repeated meetings passed between the Board's initial tabling of Webster's claim for Active Football benefits and its final decision to reject Webster's last appeal. Webster's estate insists that the delay arose while the Board was seeking to rationalize its predetermined decision to deny Webster's claim. Appellee's Br. at 49. The Plans, on the other hand, cite this time period as evidence of careful deliberation. Because we find that the Board's decision was not supported by substantial evidence, we need not endorse either of these characterizations.

tolled from March 1991 onward because of Webster's brain damage. The Plan requires that the limitations period "will be tolled for any period of time during which such Player is found by the Retirement Board to be physically or mentally incapacitated in a manner that substantially interferes with the filing of such claim." Id. Thus, the issue before the court is whether the Board abused its discretion in finding that Webster was not "mentally incapacitated in a manner that substantially interfere[d] with the filing of [his] claim." Id.

The Board is entitled to interpret the terms "mentally incapacitated" and "substantially interferes" in any reasonable manner. See J.A. 121 (Plan § 8.2(a)); Booth, 201 F.3d at 342. In its letter denying Active Football benefits to Webster, however, the Board did not define either term nor did it explain why the tolling provision should not apply to Webster's application.[10]

_____

[10]In their reply brief, the Plans for the first time propose a definition for "incapacitated," declaring that a person is incapacitated only "if 'the mind was so affected as to render him wholly and absolutely incompetent to comprehend and understand the nature of the transaction.'" Reply Br. at 21 (quoting Ortelere v. Teachers' Ret. Bd., 250 N.E.2d 460, 464 (N.Y. App. 1969)). This dilatory attempt to cabin the breadth of the term "incapacitated" is to no avail. First, the Board's discretion to interpret and define Plan terms does not allow the Plans to contrive ex post interpretations on appeal. Second, the proffered definition renders surplusage the Plan language "in a manner that substantially interferes with the filing of such a claim." That is, if "incapacitated" means "absolute incompeten[ce]," then when the Board finds that an applicant is "mentally incapacitated," it would necessarily also find that such incapacity "substantially interfere[d] with the filing of [his] claim." We cannot accept such a definition that would render other Plan language of no

30

Instead, the Board merely relied on the failure of Webster's attorney to argue expressly for the limitations period to be tolled.  See J.A. 615.

It would require delicate parsing, however, to decide that the medical and employment evidence that supports a finding of T&P disability on these facts does not also support a finding of mental incapacity that substantially interfered with the filing of Webster's claim.  We cannot hold, then, that any further burden of production lay upon Webster to invoke investigation into whether the tolling provision should apply to his case.

That is not to say that "mental incapacity" and "mental T&P disability" are coextensive.  To equate the terms would, as the Plans warn, render surplusage the words "or mentally" in the provision tolling the limitations period whenever an applicant is "physically or mentally incapacitated."  See J.A. 151 (Plan § 5.7).

The Plans argue instead that there is a higher standard for proving "mental incapacity" than for proving "T&P disability."  To put it differently, the Plans argue that all mentally incapacitated applicants would suffer from a T&P mental disability, but not all applicants suffering from a T&P mental disability would be deemed mentally incapacitated.

---

moment.  See de Nobel v. Vitro Corp., 885 F.2d 1180, 1188 (4th Cir. 1989) (warning that a benefits decision cannot be reasonable if it "render[s] some language in the plan documents 'meaningless'").

31

We need not decide whether one standard is higher or the two are merely different. Instead, we need only recognize that in some cases, an applicant suffering from a mental condition that is T&P disabling would be incapacitated to the extent that his condition "substantially interferes" with his filing of a claim. Webster's history presents just such a case.

The Plans point to Webster's numerous requests for disability applications from the Board in 1995 and 1996 as evidence that he was not mentally incapacitated. These requests, however, were at times submitted only days apart. J.A. 206-210, 215, 218. Not one of these applications was ever completed. Contrary to the Plans' assertion, these staccato requests weigh significantly in favor of a finding of mental incapacity that "substantially interfered" with Webster's ability to file a claim. For the tolling provision to have any meaning, it must extend to protect applicants such as Webster, who was so disabled that he could not even open his own mail, see J.A. 604, let alone complete any of the several benefits applications he requested without first securing significant assistance from an attorney.

Moreover, had Webster been successful in returning any one of these applications, even without any supporting documentation, the limitations provision would never have attached to his case. See J.A. 151 (Plan § 5.7) (calculating the 42-months limitations period backwards from the date the Board "first receives a written

32

application or similar letter requesting" the benefit and requiring only that such letter "begin[] the administrative process that results in the award of the benefit"). The limitations provision was only added to the Plan effective November 1, 1998, a mere six months prior to the date that Webster finally managed to submit an application for benefits.

The Plans finally insist that it would have been illogical for the Board to have found Webster mentally incapacitated from 1991 to 1998 because he was apparently well enough in 1999 to submit an application. This argument has only superficial appeal. The Plans appear to read the word "substantially" to mean "completely" in the phrase "mentally incapacitated in a manner that substantially interferes with the filing of [a] claim." Such an interpretation cannot be reasonable, however, or the tolling provision would <u>never</u> apply to an applicant who is permanently mentally incapacitated. That is, under the Plans' interpretation, the fact that an application is <u>ever</u> submitted is evidence that the applicant is not, at that time, suffering from incapacity that "substantially interferes" with the filing of a claim. Instead, we have held that the Board must interpret the tolling provision to give meaning to each word. <u>See</u> <u>de Nobel</u>, 885 F.2d at 1188. The Plans' suggested reading of the tolling provision is thus unreasonable.

At bottom, the evidence of Webster's brain damage tends to show not only that he was T&P disabled, but that he was "mentally

33

incapacitated in a manner that substantially interfere[d]" with the filing of his claim. J.A. 151 (Plan § 5.7). The Board has not presented substantial evidence on which to deny Webster the protection of the provision tolling the limitations period. We therefore hold that the Board abused its discretion in applying the limitations provision to bar Webster's claim for Active Football benefits retroactive to March 1991.

IV.

The Plans finally ask us to vacate the award of attorney's fees and costs to Webster's estate.[11] They advance only one argument on appeal supporting the request--that attorney's fees and costs are inappropriate because Jani should not have prevailed on the merits. Because the Plan failed to make any other argument, the award of attorney's fees and costs should be upheld provided that Webster's estate remains "a prevailing party" on a substantive issue on appeal. See Martin v. Blue Cross & Blue Shield of Va.,

---

[11]In ERISA actions, a district court has wide latitude in deciding whether to award attorney's fees and costs. See § 1132(g)(1); Metro. Life Ins. Co. v. Pettit, 164 F.3d 857, 865 (4th Cir. 1998). The district court here found significant that the Board ignored the opinion of its own medical doctor and the "overwhelming evidence supporting Webster's claim, . . . relying instead on Webster's oncologist" to make the definitive neurological determination. Jani v. Bert Bell/Pete Rozelle NFL Player Ret. Plan, No. 04-1606, at *3-4 (D. Md. November 7, 2005). Because the district court thus found that the Board's "decision indicates culpable conduct, if not bad faith," it awarded attorney's fees to Webster's estate. Id. at *4-5.

34

115 F.3d 1201, 1210 (4th Cir. 1997) ("[O]nly a prevailing party is entitled to consideration for attorneys' fees in an ERISA action."). Webster's estate has prevailed on appeal, and we therefore uphold the award of attorney's fees and costs.

V.

Because there is nothing in this record on which to uphold the Board's denial of Webster's application for Active Football benefits, the decision of the district court is

AFFIRMED.